**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

**THERESA L. MOORE,**
    **Plaintiff,**

**-vs-**              **Case No. 6:08-cv-342-Orl-18KRS**

**COMMISSIONER OF SOCIAL
SECURITY,**
    **Defendant.**
_____

**REPORT AND RECOMMENDATION**

**TO THE UNITED STATES DISTRICT COURT**

   This cause came on for consideration without oral argument on the Complaint filed by Theresa L. Moore, seeking review of the final decision of the Commissioner of Social Security denying her claim for social security benefits. Doc. No. 1. The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA). Doc. Nos. 12, 14.

**I.  PROCEDURAL HISTORY.**

   On November 15, 2005, Moore applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq.* (sometimes referred to herein as the Act). R. 62-66. She alleged that she became disabled on March 1, 2004. *Id.* Moore's applications were denied initially and on reconsideration. R. 44-46, 48-50.

Moore requested a hearing before an administrative law judge (ALJ). R. 43. An ALJ held a hearing on July 31, 2007. Moore, represented by an attorney, testified at the hearing. R. 230-55.

After considering the testimony and the medical evidence presented, the ALJ determined that Moore was insured under OASDI through June 30, 2009. R. 13. The ALJ found that Moore had not engaged in substantial gainful activity since May 30, 2004, the alleged onset date of her disability.[1]  *Id.*

The ALJ concluded that the medical evidence showed that Moore had cervical pain, status-post anterior cervical disc fusion (ACDF), and migraine headaches, which were severe. *Id.* These impairments did not meet or equal any of the impairments listed in the applicable social security regulations (the Listings).[2] R. 13-14. The ALJ found that Moore had the residual functional capacity (RFC) to perform the full range of sedentary work.[3] R. 14.

---

[1] Although this date differs from the one listed on her application, Moore does not object to the discrepancy. *See also* R. 237 (ALJ referring to May 30, 2004, date during hearing). The parties were advised that issues not specifically raised would be waived. Doc. No. 13.

[2] The Code of Federal Regulations "contains a Listing of Impairments . . . specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories." *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

[3] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567.

In reaching this conclusion, the ALJ gave little weight to the opinions of the state agency medical consultants who completed RFC forms because "additional evidence received into the record at the hearing level convince[d] the [ALJ] that [Moore] was more limited than originally thought." R. 17. The ALJ also cited the "lack of significant findings" by Dr. Ronald Stern and the unremarkable findings by Dr. Jonathan Paine. *Id.*

The ALJ also found Moore's testimony about the limitations arising from her impairments was not totally credible based on Moore's "description of her activities and lifestyle, the degree of medical treatment required, discrepancies between [her] assertions and information contained in the documentary reports, [her] demeanor at hearing, the reports of the treating and examining practitioners, the medical history, the findings made on examination, and [her] assertions concerning her ability to work." *Id.*

Because Moore's past relevant work required more than a sedentary level of exertion, the ALJ concluded that Moore could not return to her past relevant work. R. 17-18. The ALJ relied exclusively on the Medical-Vocational Guidelines (the Grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, at step five of the sequential evaluation to conclude that there was work available in the national economy that Moore could perform. R. 18. Therefore, he found that Moore was not disabled. *Id.*

Moore requested review of the ALJ's decision. R. 225-29. On January 9, 2008, the Appeals Council issued a decision finding no basis to review the ALJ's decision. R. 4-6. Moore timely sought review of this decision by this Court. Doc. No. 1.

## II.     JURISDICTION.

Plaintiff having exhausted her administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

## III.    STATEMENT OF FACTS.

After a complete review of the record, I find that the essential facts of record are set forth in the ALJ's decision and in the parties' memoranda.  Accordingly, I will only summarize the pertinent facts to protect Moore's privacy to the extent possible.

*A.     Testimony by Moore.*

At the time of the ALJ's hearing, Moore was 38 years old.  R. 234.  She attended school through the eleventh grade.  *Id.*  She lived with her husband and her thirteen-year-old son.  *Id.*

Moore previously worked as an assembler of circuit boards, R. 235-36, a crew person in a fast food restaurant, R. 236, and as a housekeeper, R. 237.  She was injured in May 2002 working at a restaurant drive through when she slipped and fell on a recently mopped floor.  R. 240-41.  She made a worker's compensation claim and was put on light duty.  R. 239.  She stopped working in 2004.  *Id.*

The slip-and-fall incident in May 2002 caused injury to her right elbow and her "neck and back started to stiffen up."  R. 241, 243.  She saw physicians through her employer's workers' compensation coverage.  *Id.*  She had surgery on her neck on January 26, 2004.  R. 241.  Moore testified that the surgery repaired the problems with her neck, but "didn't take the pain away."  R. 242.  Moore had problems picking things up due to pain in both her shoulders, and she dropped things in the kitchen.  R. 243, 246.  She testified that she could

"hardly do anything" and was "constantly in pain." R. 243. It hurt to lift her hands over her head. R. 244. She could only sleep for about two hours without waking up due to pain in her arms and neck, sometimes taking two to three hours to get back to sleep. R. 245.

She also had severe headaches up to three to four times a week, each occurrence lasting up to two days. R. 244. When she had a headache, she took her medication and went to bed. *Id.* She took Ultram (Ultracet), Robaxin, and Flexeril for her headaches. *Id.* Ultram and Robaxin taken together made her sleepy, and Flexeril upset her stomach during the day, forcing her to take it at night. R. 245. The medications alleviated her pain until they "wear[] off." R. 252.

Moore testified that she took care of her own personal hygiene, including dressing herself, though she sometimes needed some help with her hair or lifting her shirt. R. 245-46. She cared for her teenage son during the day, R. 246, 251-52, and sometimes cooked meals for her family, R. 246. She tried not to perform household chores often, but would do them if she had to, R. 247, or if she had help, R. 253. She could not do a lot, and the exertion caused her to be "down for [the] rest of the day." R. 247. Vacuuming caused pain in her arms, neck, and "all over." *Id.*

She attended church almost every Sunday, but she had to move around if she sat for too long. R. 247-48. She drove her husband to work every work day, R. 235, drove her son to school every school day, R. 251-52, went to the grocery store and leaned against a cart while shopping twice a week, R. 249, and went out to dinner with her family once a week,

R. 248. Otherwise, she spent most of her day sitting or lying down watching television or reading. R. 252-53.

Moore estimated that she could stand for approximately half an hour, and sit comfortably for half an hour before needing to change positions. R. 248, 250. She could walk from her door to the grass, approximately 50 feet, when she walked her dogs. R. 248-49. She walked the dogs about three times a day. R. 249. She estimated that she could lift no more than 10 pounds. R. 251.

*B.    Medical and Workers' Compensation Records.*

Moore filed a workers' compensation claim for injuries suffered at work on May 15, 2002, as a result of a slip and fall. She indicated that she injured her right elbow and leg. R. 67.

Treatment notes reflect that Moore sought care with Arthur Stember, M.D., her primary care physician, on January 7, 2004 complaining of cold and flu symptoms. At that time, she was taking Ultracet for neck pain, Lortab, Vioxx, Norflex, Robaxin, and other medications. R. 158-59. On January 15, 2004, Moore complained to Dr. Stember of cervical pain. R. 157. Dr. Stember noted that Moore had been seeing her workers' compensation doctors for neck pain. R. 154.

Dr. Stember treated her on March 11, 2004, at which time she complained of a sinus headache. R. 153. On May 19, 2005, Moore reported that she had experienced only one headache since her last office visit, and that she had no neck pain. R. 152. He diagnosed headaches and back/neck spasms, which he treated with Flexeril. *Id.*

On June 23, 2005, Dr. Stember treated Moore at a regular follow-up visit related to her May 2002 neck injury and an unspecified back injury due to a fall. R. 151. According to the treatment notes, Moore complained of headaches due to high blood pressure. She also complained of back pain that was not effectively treated with Robaxin. Upon examination, Dr. Stember observed that Moore's neck was very tight and she had palpable spasms. R. 151. His diagnosis was high blood pressure (HTN) and cervicalgia. He prescribed Ultracet, Robaxin, and Flexeril. *Id.*

On July 7, 2005, Moore saw Dr. Stember again, reporting back pain with some severe headaches. R. 150. She indicated that Ultracet generally controlled her pain, but sometimes her pain was too severe for the medication to be effective. *Id.* Dr. Stember diagnosed Moore with cervicalgia, headaches and back pain, but did not prescribe any new medications. *Id.* During an office visit on July 12, 2005, for other treatment, Moore reported no headaches in the five days between visits. R. 149. She also indicated that trigger point steroid injections helped relieved her shoulder and neck pain "'very much.'" *Id.*

On July 22, 2005, Moore saw Dr. Stember for back pain, which she reported as being 8 out of 10 on a pain scale. R. 148. She reported spasms in her neck and upper trapezius muscles. *Id.* Dr. Stember continued epidural steroid injections at four trigger points. *Id.* At a July 29, 2005, visit, Moore reported that her back pain was better with only a few spasms. R. 147. She reported that her back and upper trapezius pain before the injections was 7 out of 10, but after treatment was only 3 out of 10. *Id.*

On August 26, 2005, R. Richard Ramnath, M.D., an ABR Certified Diagnostic Radiologist, conducted an MRI of Moore's cervical spine for Dr. Stember. R. 144-45. Dr. Ramnath's impressions of the MRI were that Moore had "[m]ultilevel degenerative changes and disc protrusions at several levels of the cervical spine resulting in varying degrees of central and foraminal stenosis as described." R. 145. Dr. Ramnath found the C4-5 and C5-6 levels most severely affected. The C4-5 and C6-7 levels appeared "worse when compared to the previous exam," while disc protrusion at C5-6 appeared stable. *Id.* Dr. Stember's impression was that Moore had mulitlevel degenerative disc disease (DDD). He referred Moore to Jonathan T. Paine, M.D., F.A.C.S., for further treatment. R. 143.

Dr. Stember treated Moore again on October 14, 2005, to discuss medications for her back, neck pain and headaches, because she reported that the medications were not helping her. R. 142. Dr. Stember prescribed a Sterapred Dose Pack and noted that he would consider increasing the dosage of Flexeril in the future. *Id.*

Dr. Paine first treated Moore on October 31, 2005, for a herniated cervical disc. He found her to be well-developed and well-nourished, and in "moderate distress" due to neck and back pain. R. 197. Dr. Paine reviewed the MRI taken in August, and recommended cervical traction, further studies, and recommended that Moore consider a cervical discectomy and fusion. R. 198.

Dr. Paine examined Moore again on January 4, 2006. She reported that her neck and back pain "radiat[ed] into the bilateral upper extremeties," and that the pain worsened with activity, but improved with rest. R. 195. He noted that the course of cervical traction did not

have a "long lasting benefit." *Id.* Dr. Paine's examination again found Moore to be well-developed and well-nourished, and in "moderate distress" due to her neck and back pain. *Id.* He found Moore to be awake, alert, and oriented, with intact cranial nerves, a normal gait and station, and normal strength, tone, and coordination. Her sensation appeared to be intact, and her deep tendon reflexes normal, with down-going toes. Dr. Paine "[did] not feel there [was] substantial enough protrusion in the C7 nerve root on the left side to warrant surgical management." R. 195-96. Therefore, he recommended a "two level anterior cervical discectomy and fusion secondary to the lack of improvement to date." R. 196.

Dr. Paine performed the recommended surgery on January 26, 2006. R. 161-64. Moore was discharged the next day, with no limitations on her activities other than not extending her neck all the way back. R. 171. Dr. Paine prescribed Percocet every four hours as needed for pain. R. 172.

Dr. Paine followed up with Moore on February 6, 2006. She reported "feel[ing] improvement over the preoperative status." R. 194. Dr. Paine prescribed Percocet and scheduled a follow-up appointment. *Id.* On March 6, 2006, Moore saw Dr. Paine again, and reported pain in the back of her neck, which worsened with activity. R. 193. Dr. Paine felt the pain was "probably secondary to deconditioning" and referred her to physical therapy. *Id.* On April 17, 2006, Dr. Paine saw Moore for a second follow-up appointment. Moore reported moderate pain, though the x-rays were normal. R. 192. Dr. Paine opined that her pain would "improve with the use of cervical traction," and prescribed Ultracet. *Id.*

Moore next sought treatment from Ronald Stern, M.D., on January 3, 2007. R. 222. She reported headaches, neck pain, upper back pain and shoulder pain that was greater on her right side than her left. She described her pain as "intermittent achy, burning pain in the neck, upper back and shoulders with intermittent headaches," which worsened with activity and improved with rest. *Id.* Her pain rating was a 5, but her quality of life rating was 10. R. 223. Dr. Stern found her to be well-developed and well-nourished and in "no acute distress." *Id.* Moore had a normal gait, was able to walk on both heels and toes, and had normal reflexes. His examination revealed pain during cervical flexion, restricted cervical extension rotation bilaterally, and paracervical tenderness. He also observed bilateral upper back tenderness on the right side greater than the left. *Id.* His impression was that Moore had cervical degenerative disk disease, cervical facet arthropathy and myofascial neck and upper back pain. *Id.* Dr. Stern recommended an epidural steroid injection, which he administered on January 25 and February 9, 2007. R. 220-21, 223-24.

Dr. Stern examined Moore again on February 22, 2007. She reported no significant improvement in her condition after the injections. and indicated that she felt she could not function with her level of pain. R. 218. Dr. Stern's examination of her gait and upper extremity reflexes was unchanged from the January 3, 2007, examination. *Id.* He found reduced cervical range of motion, but reported Moore was in "no acute distress." *Id.* He offered physical therapy to her, but she declined because therapy was "painful for her." R. 219.

On May 16, 2007, Moore presented at Wuesthoff Hospital with neck pain and pain in her left shoulder and left arm, R. 211-12, that she had exacerbated by sleeping on the couch, R. 212. Upon examination, muscle spasms and vertebral point-tenderness were observed. R. 213. The treating physician, Joseph Andris, M.D., diagnosed Moore with an acute exacerbation of chronic neck pain. R. 213. That evening, she reported her pain had lessened after taking Percocet. R. 215.

On May 25, 2007, Dr. Stern examined Moore. R. 216. She reported neck pain, upper back pain, bilateral shoulder pain, and left upper extremity pain. Her pain was "much worse on the left side compared to the right." *Id.* She had been evaluated for physical therapy but could not afford the treatment. She reported using Ultram (Ultracet) and Robaxin, both of which provided some relief. She reported her pain as 8 on a scale of 10, and quality of life as 6. Dr. Stern observed that she was alert and oriented, with restricted cervical flexion and extension rotation. Her gait was not antalgic. Dr. Stern observed that Moore could rise on her heels and toes, had normal reflexes, and could touch her hands together over her head. *Id.* His impression was that Moore had cervical degenerative disk disease (DDD) and myofascial neck and upper back pain secondary to the DDD. R. 217. Dr. Stern renewed her prescription for Ultram (Ultracet) and Robaxin, ordered nerve conduction studies of both upper extremities, and recommended the use of a TENS unit. *Id.*

### C. Reviewing Professionals.

On March 24, 2006, Gloria Hankins prepared a physical RFC assessment after review of Moore's records. R. 184-91. She concluded that Moore could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday. R. 185.

On August 19, 2006, Violet Acero Stone, M.D., prepared a physical RFC assessment after review of Moore's records. R. 203-10. She concluded that Moore could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday. R. 204. She also could not frequently engage in overhead activity due to residual neck pain. R. 206.

## IV. STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits. 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits. In sum, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?
>
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
> (4) Is the claimant unable to perform his or her former occupation?
>
> (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. § 404.1520(a)(4). An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability. A negative answer leads to a finding of "not disabled." *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)). However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform." *Id.* at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d

1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id.*

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**V.    ANALYSIS.**

Moore asserts three interconnected grounds supporting reversal. She contends the ALJ erred by improperly applying the pain standard in addressing the limitations arising from her pain, and erred in finding that her testimony concerning her pain was not totally credible. She argues that if the ALJ had properly assessed her nonexertional limitations, reliance solely on the Grids at step five of the sequential evaluation would have been improper. These are the only issues I will address.[4]

The United States Court of Appeals for the Eleventh Circuit applies what has become known as the "pain standard" to assess subjective symptoms, including pain.

> Under the pain standard followed in this circuit, the Commissioner "must consider a claimant's subjective testimony of pain if [he] finds evidence of an underlying medical condition, and either (1) objective medical evidence to confirm the severity of the alleged pain arising from the condition, or (2) that the objectively determined medical condition is of a severity that can reasonably be expected to give rise to the alleged pain."

*Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). The ALJ followed the pain standard. He found that Moore had a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. R. 16. Unlike *Geiger v. Apfel*, No. 6:99-CV-12-Orl-18B, 2000 WL 381920 (M.D. Fla. Feb. 9, 2000), cited by Moore, the ALJ did not also require that Moore present objective evidence that confirmed the severity of the alleged pain.

---

[4] The parties were advised that issues not specifically raised would be waived. Doc. No. 13.

After finding that the pain standard was met, the ALJ was required to determine the functional limitations arising from the subjective symptoms. This is a credibility determination, in which the ALJ considers the effectiveness of medication and the individual's ability to perform daily activities, among other things. *See, e.g.*, Soc. Sec. R. 96-7p, 1996 WL 374186, at *3 (July 2, 1996). If the ALJ discredits the claimant's subjective testimony, he "must articulate explicit and adequate reasons for doing so." *Foote*, 67 F.3d at 1561-62.

The ALJ articulated explicit and adequate reasons for finding Moore's testimony about the limitations arising from pain to be not completely credible. Specifically, the ALJ found that Moore's activities of daily living were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." R. 16. In support of this finding, the ALJ cited Moore's ability to take care of her thirteen-year-old son, drive her husband to work and her son to school, take care of her personal needs and hygiene, perform some household chores "if she has to,"[5] attend church, and go to a movie now and then. R. 16.

The ALJ also relied on the reports of examinations by Drs. Stern and Paine. Contrary to Moore's argument, the ALJ did not find that Dr. Stern "did not find any significant findings upon physical examination." Doc. No. 15 at 10. Rather, the ALJ noted that Dr. Stern found tenderness in various areas, R. 17, and acknowledged his diagnoses of cervical degenerative disc disease, cervical facet arthropathy, and myofascial neck and upper back pain, R. 15. Moore is correct that the ALJ described Dr. Paine's examination of Moore as

---

[5] This finding illustrates that the ALJ did not "totally ignore[ ] the testimony from the claimant in regards to how she performs" activities of daily living. Doc. No. 15 at 14-15.

-16-

"unremarkable." R. 17. This is consistent, however, with Dr. Paine's conclusions that Moore's x-rays were normal and her pain was probably due to deconditioning. Finally, neither Dr. Stern nor Dr. Paine placed any limits on Moore's functional ability, other than not to extend her neck all the way back immediately following surgery.

Additionally, the ALJ noted significant gaps in medical treatment, and that medical records revealed that medications had been "relatively effective in controlling" Moore's pain. R. 16. The ALJ correctly noted that side effects from medications were generally mild and would not interfere with Moore's ability to work. The ALJ also observed that Moore displayed no evidence of pain or discomfort while testifying at the hearing. *Id.*[6] All of these facts are supported by evidence in the record.

Moore is correct that the ALJ did not describe every limitation on activities of daily living about which she testified, and he did not set forth every finding made by Drs. Stern and Paine regarding pain on range of motion. Nevertheless, the ALJ's decision reflects that the ALJ reviewed the entire record and articulated reasons supported by the evidence to support his credibility finding regarding the nature, intensity, persistence and limiting effects of the pain. Under these circumstances, I recommend that the Court find that the ALJ did not err regarding his decision as to Moore's credibility. *See, e.g., Walker v. Comm'r*, No. 6:07-cv-1647-Orl-18KRS, 2008 WL 5100120, at * 6 (M.D. Fla. Dec. 2, 2008).

Because the ALJ found that Moore's pain did not limit her ability to perform the full range of sedentary work, exclusive reliance on the Grids at step five of the evaluation

---

[6] It is not improper for an ALJ to consider a claimant's demeanor during the hearing as part of the evidence as a whole. *See Norris v. Heckler*, 760 F.2d 1154, 1158 (11th Cir. 1985).

process was appropriate.  *See Reeves v. Heckler*, 734 F.2d 519, 525-26 (11th Cir. 1984). Accordingly, the ALJ did not err in relying on the Grids at step five of the sequential evaluation process.

**VI. RECOMMENDATION.**

For the reasons set forth herein, it is **RESPECTFULLY RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.  I further recommend that the Court direct the Clerk of Court to issue a judgment consistent with this Order and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on August 24, 2009.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE